**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Darion Floyd | |
| Plaintiff, | No. 22 CV 01761 |
| v. | Honorable Nancy L. Maldonado |
| Michael Squires, et al., | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Pro se Plaintiff Darion Floyd brings this civil rights action pursuant to 42 U.S.C. § 1983 against Cook County Jail officers Michael Squires, Thomas Rusher, Miguel Garza, and Steven McCreedy ("Defendants") in their individual capacities. Floyd alleges that Defendants used excessive force against him during an incident at the Jail on July 7, 2021. Defendants have moved for summary judgment (Dkt. 63)[1] arguing that: (1) Floyd failed to exhaust his administrative remedies; (2) Defendants used reasonable force under the circumstances; and (3) Defendants are entitled to qualified immunity. For the reasons that follow, the motion is granted. In short, the Court concludes that Defendants used reasonable force as a matter of law, and they are therefore entitled to summary judgment in their favor.

**Background**

**I.      Northern District of Illinois Local Rule 56.1**

Before setting forth the relevant factual background, the Court must first address Floyd's failure to comply with Northern District of Illinois Local Rule 56.1, which governs the procedures

---

[1] In citations to the docket, page numbers are taken from the CM/ECF headers, except for deposition transcripts in which case the Court cites to the internal transcription page number.

for filing and responding to motions for summary judgment in this District. The rule is intended "to aid the district court, which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information, in determining whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (cleaned up). Local Rule 56.1(a) requires the moving party to provide a statement of material facts that complies with Local Rule 56.1(d). N.D. Ill. LR 56.1(a)(2). Local Rule 56.1(d) requires that "[e]ach asserted fact must be supported by citation to the specific evidentiary material, including the specific page number, that supports it. The court may disregard any asserted fact that is not supported with such a citation." N.D. Ill. LR 56.1(d)(2). The opposing party must then respond to the movant's proposed statements of fact. *Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005); N.D. Ill. LR 56.1(e). In the case of any disagreement, "a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact. Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." N.D. Ill. LR 56.1(e)(3). "[M]ere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material." *Smith v. Lamz,* 321 F.3d 680, 683 (7th Cir. 2003).

Because Floyd is proceeding pro se, Defendants served him with a "Notice to Pro Se Litigant Opposing Motion for Summary Judgment" as required by Local Rule 56.2. (Dkt. 66.) The notice provided Floyd with copies of Defendants' summary judgment papers, as well as copies of Federal Rule of Civil Procedure 56 and Local Rules 56.1 and 56.2. Floyd responded to Defendants' motion by filing a short memorandum raising various factual and legal arguments, but he failed to comply with Local Rules 56.1(b) and (e) in that he did not file a separate statement responding to Defendants' Local Rule 56.1(a) statements of material fact. (Dkt. 69.)

Because Floyd has not properly responded to Defendants' factual statements, the Court will accept Defendants' statements as true to the extent supported by the record. *Lamz*, 321 F.3d at 683. Although the Court is generally entitled to demand strict compliance with Local Rule 56.1, even from pro se litigants, *see Coleman v. Goodwill Indus. of Se. Wis., Inc.*, 423 F. App'x. 642, 643 (7th Cir. 2011) (unpublished), the Court is also mindful that it should generally construe pro se filings liberally. *See, e.g.*, *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) (noting that district courts are entitled to take a flexible approach and construe a pro se litigant's summary judgment filings leniently). Further, the failure to strictly comply with Local Rule 56.1, or indeed to respond at all to a motion for summary judgment, does not automatically warrant judgment in favor of the moving party, which still bears the burden to show that summary judgment is warranted. *See Raymond v. Ameritech Corp*., 442 F.3d 600, 608 (7th Cir. 2006) (noting that the moving party has "ultimate burden of persuasion" to show entitlement to judgment as a matter of law).

In short, while the Court will accept Defendants' statements of fact as admitted when they are supported, it will also generously construe Floyd's submission and will consider the facts identified by Floyd in his brief when they are supported by the record, or to the extent he could properly testify to them. The Court will also keep in mind that Defendants bear the burden of persuasion on their motion, notwithstanding Floyd's limited responsive submission.

## II.    Relevant Facts[2]

Except as otherwise noted below, the following represents the undisputed facts as stated in Defendants' Local Rule 56.1 statement, (Dkt. 63-1), though the Court retains discretion to

---

[2] This Court has federal question subject matter jurisdiction under 28 U.S.C. § 1331, and venue is appropriate under 28 U.S.C. 1391(b) because a substantial part of the events giving rise to this claim occurred at the Cook County Jail, which is located in the Northern District of Illinois.

"consider other materials in the record" where appropriate. Fed. R. Civ. P. 56(c)(3). As noted above, the Court will also set forth any additional asserted facts from Floyd's response to the extent they are supported by the record. The record also contains video surveillance footage of the incident at issue, which the Court may rely on "to the extent that it establishes the events 'with confidence' and 'beyond reasonable question.'" *See Est. of Eason by Eason v. Lanier*, No. 18 C 5362, 2021 WL 4459469, at *2, 7 (N.D. Ill. Sept. 29, 2021) (citing *Lopez v. Sheriff of Cook Cty*., 993 F.3d 981, 984 (7th Cir. 2021) (noting that a court may "take stock" of video evidence "without favoring the nonmovant where the video contradicts his view of the facts.").

The instant lawsuit arises from an incident that occurred at the Cook County Jail on July 7, 2021. At that time, Floyd was a pretrial detainee at the Jail and was housed in a segregated housing unit in Division 9, Tier 1E. (Dkt. 63-1 ¶¶ 1, 4.) Floyd had a history of threatening correctional officers with violence, and from approximately 2019 through the date of the incident in 2021, he had been sent to segregation for disciplinary infractions on about 10 different occasions. (*Id.* ¶¶ 3–4.) Floyd was in segregated housing in July 2021 in particular as punishment for disobeying an officer in a previous incident sometime in June 2021. (*Id.* ¶ 5.) That prior incident occurred during an educational course at the Jail after the instructor asked Floyd to leave the classroom because he had been disruptive. (*Id.* ¶¶ 6–7.) Floyd refused to leave and had to be forcibly removed by a correctional officer. (*Id.* ¶¶ 8–10.) Because of this incident, Plaintiff was serving a 21-day sentence in segregated housing at the time of the incident at issue in this case. (*Id.* ¶¶ 11–12.)

As to the events giving rise to this lawsuit: On July 7, 2021, Floyd was sitting in the Tier 1E dayroom with his cellmate. (*Id.* ¶ 13.) Floyd was handcuffed with his hands in front of himself, he was restrained with a blue box over his handcuffs connected to a chain around his waist, and

4

his feet were shackled. (*Id.* ¶¶ 14–17.) Defendant Officer McCreedy, who was also on the tier, approached Floyd and his cellmate and told them that it was time to lock up. (*Id.* ¶ 18.) Officers then returned Floyd's cellmate to his cell first without incident. (*Id.* ¶ 19.) Floyd, however, told Officer McCreedy that he wanted to shower and that he refused to lock up before he did so. (*Id.* ¶¶ 20–21.)

Officer Touhy, who is not a defendant in this case, approached Floyd and took his right arm, while Officer McCreedy approached and took Floyd's left arm. (*Id.* ¶¶ 22–24.) Floyd resisted getting up, however, and Defendant Officer Rusher, who was also on the tier, rushed to help Officers McCreedy and Touhy. (*Id.* ¶ 26.) Defendants describe the next sequence of events as follows: Floyd planted himself on the dayroom floor and actively resisted the officers' attempts to secure him and move him to his cell. (*Id.* ¶ 27.) Officers McCreedy and Touhy then proceeded to lift Floyd from the ground and move him towards cell door. (*Id.* ¶¶ 28–29.) Floyd then "writhed" beside his cell door as Officers Rusher and Touhy restrained him against the wall, while Officer McCreedy removed the shackles from Floyd's ankles. (*Id.* ¶ 30.) Defendants Officer Garza and Sergeant Squires arrived a short time later to help the other officers secure Plaintiff in his cell. (*Id.* ¶¶ 31–32.)

As he was being held against the wall, Floyd, who has a metal plate in his head, threatened to kill himself and began bashing his head against the wall. (*Id.* ¶ 33–35.) Floyd also admitted in his deposition that he was angry with officers for refusing his request for a shower, and he further admitted that he was being uncooperative as they attempted to move him to his cell. (*Id.* ¶¶ 36–37.) Floyd also admits that he argued with and threatened Defendants, including by threatening to spit on them. (*Id.* ¶ 38; *see also* Pl.'s Dep. Tr., Dkt. 63-3, at 71:21–23.)

Defendants eventually opened Floyd's cell door and moved him to the doorway of the cell.

(*Id.* ¶ 39.) As they were moving him, the officers fed the chain attached to Floyd's handcuffs through the food-port opening in the cell door, and Officer Touhy continued to hold onto the chain. (*Id.* ¶¶ 40–41.) Defendants assert that inmates can weaponize their handcuffs and other restraints if they are not controlled by correctional personal, and that Floyd's handcuffs therefore could not be removed without Floyd putting his hands through the food-port opening. (*Id.* ¶¶ 42–43.)

But while the officers fed the chain through the food-port opening, Floyd did not place his hands through food port and attempted to keep the officers from closing the cell door. (*Id.* ¶¶ 44–48.) Floyd twisted his body and not only tried to keep officers from closing the door, but also attempted to leave the cell. (*Id.*) During this time, Touhy continued to hold onto the chain connected to Floyd's handcuffs, which was fed through the food-port opening. (*Id.* ¶ 41.) After about 10 seconds, officers were able to get Floyd into the cell and close and secure the door. (*Id.* ¶¶ 49–51.)

At some point during the approximately 10-second struggle in the cell doorway, as Defendants were attempting to get Floyd into his cell and close the door, Floyd suffered a laceration to his lower right arm. Floyd testified that the laceration was caused by Defendants pulling the chain attached to his arm through the food port. (*See* Pl.'s Dep., Dkt. 63-3, at 66:6-67:21; 71:6-20.) Floyd further testified that his handcuffs were tight on his wrists, and that the pressure of Defendants pulling on the chain attached to the handcuffs caused the laceration. (*See id.* at 67:8-21.) Floyd adds in his brief that the injury required stitches, and he still has a scar today. (Dkt. 69 at 1.) Defendants, on the other hand, do not directly discuss Floyd's injury in their statement of facts, but instead repeat that Floyd's hands were not through the food port as they initially attempted to secure him in the cell, and further they maintain that they did not use any force against Floyd once his cell door was closed and his hands were finally though the food port.

6

(Dkt. 63-1 ¶¶ 44, 52–53.)

In terms of the video evidence of the incident: the record contains footage from two surveillance cameras, as well as body-worn camera footage from one of the officers. (Dkt. 70.)[3] The surveillance camera footage generally corroborates Defendants' description of events above: Floyd can be seen sitting in the tier when two officers approach, and after the officers grab Floyd to take him to his cell, Floyd can be seen attempting to resist the officers by trying to pull away from them, making his body go limp, and trying to lay on the floor. (Dkt. 70, Video 1.041 at 17:15–17:50.) Floyd also attempts to hook his foot around one of the seats of the table he was at to apparently stop the officers from pulling him away. (Dkt. 70, Video 1.040 at 17:15–17:30.) After Floyd is moved beside his cell door, the footage shows him banging his head against the wall, and he can be seen struggling with officers as they attempt to get him moved into his cell. (Dkt. 70, Video 1.041 at 19:50–21:38.) The footage confirms that officers opened the cell door and fed the chain attached to Floyd's handcuffs through the food port, and the officers can then be seen struggling with Floyd to get him into the cell for approximately 10 seconds before they are finally successful in closing the door. (*Id.* at 21:00–21:37.) The body-worn camera footage, portions of which contain audio, also depicts Floyd struggling and arguing with officers, including threatening to spit on them. (Dkt. 70, BWC Video at 0:20–2:30.) Neither the security camera nor body-worn camera footage clearly depict the moment Floyd was injured—given the angle of the footage and placement of officers around the door—though after struggling with officers at the cell door for several seconds, Floyd can be heard on the body-worn camera footage yelling in pain about his wrists. (*Id.*) The body-worn camera footage then shows Floyd with his arms through the food-port

---

[3] Defendants do not identify which officer the footage belongs to, though it appears to the Court to be Defendant Seargent Squires. Defendants indicate Squires was the last to arrive, and the body-worn camera footage appears to belong to the last officer to arrive on the scene.

opening, bleeding from a cut on his right wrist. (*Id.* at 2:20–2:40.)

About 45 seconds after closing the cell door, Defendants reopened the cell to release Floyd. (Dkt. 63-1 ¶ 54.) Neither the record nor footage is clear about where Floyd was taken after he was released from his cell, though Floyd contends he received stitches for the laceration. Floyd ultimately received 35 days of segregation for staff assault as a result of this incident. (*See id.* ¶ 55.)

On July 21, 2021, Floyd submitted a grievance about the July 7 incident. (*Id.* ¶ 56.) Floyd received a response to that grievance the next day indicating that the grievance had been referred to the Office of Professional Review ("OPR"). (*Id.* ¶ 57; Dkt. 63-6 at 5.) In the portion of the response form for detainees to request an appeal, Floyd filled out the date box with a date of July 26, 2021, but he did not write anything down as to the basis for the appeal, though he testified that he knew that he should have. (Dkt. 63-1 ¶¶ 58–60.) In the meantime, the OPR investigated Floyd's allegations and ultimately issued a report in September 2021 concluding that the evidence did not show any staff misconduct, and OPR recommended that the investigation be closed. (*Id.* ¶¶ 61–65.)

## Standard of Review

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute about a material fact exists "if the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Genuine issues of material fact are not demonstrated by the "mere existence of some alleged factual dispute between the parties," *id.* at 247, or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 586 (1986). Rather, "[t]he controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016). Once the party moving for summary judgment demonstrates the absence of a disputed issue of material fact, "the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carrol v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). The non-movant must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Hannemann v. S. Door Cnty. Sch. Dist.*, 673 F.3d 746, 751 (7th Cir. 2012).

In resolving a motion for summary judgment, the Court construes all evidence and draws all reasonable inferences in the non-movant's favor. *Malen v. MTD Prods., Inc.*, 628 F.3d 296, 303 (7th Cir. 2010). The Court, however, makes "only reasonable inferences, not every conceivable one." *Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 730 (7th Cir. 2014); *Nichols v. Mich. City Plant Plan. Dep't*, 755 F.3d 594, 599 (7th Cir. 2014) (the non-movant "is not entitled to the benefit of inferences that are supported by only speculation or conjecture"). Further, when there is video evidence in the record, the Court may "take stock of what the video evidence shows without favoring [the non-movant] where the video contradicts his view of the facts." *See Lopez*, 993 F.3d at 984.

## Discussion

Floyd's form civil rights Complaint asserts a single cause of action under 42 U.S.C § 1983, alleging that the Defendants violated his constitutional rights through the use of unjustified excessive force. (Dkt. 8.) Defendants have moved for summary judgment, arguing that they are entitled to judgment on Floyd's § 1983 claim for three independent reasons: 1) Floyd failed to exhaust his administrative remedies; (2) Defendants used reasonable force under the circumstances

as a matter of law; and (3) Defendants are entitled to qualified immunity. As explained further below, while the Court finds that Floyd adequately exhausted his administrative remedies, the Court ultimately concludes, based on all the record evidence, that Defendants used reasonable force under the circumstances as a matter of law. Defendants are therefore entitled to judgment in their favor, and the Court need not address whether Defendants are also entitled to qualified immunity.

## I.        Exhaustion of administrative remedies

The Prison Litigation Reform Act ("PLRA") requires an inmate who brings a civil rights complaint to first exhaust his available administrative remedies within the correctional system. 42 U.S.C. § 1997e(a); *see*, *e.g.*, *Crouch v. Brown*, 27 F.4th 1315, 1320 (7th Cir. 2022); *Barnes v. Briley*, 420 F.3d 673, 677 (7th Cir. 2005). This exhaustion requirement is mandatory; "a court may not excuse a failure to exhaust." *Ross v. Blake*, 578 U.S. 632, 639 (2016). To fulfill the exhaustion requirement, an inmate must comply with the procedures and deadlines established by the correctional facility's policies. *Crouch*, 27 F.4th at 1320; *Hernandez v. Dart*, 814 F.3d 836, 842 (7th Cir. 2016). Because failure to exhaust is an affirmative defense, the burden is on the defendant to prove that a plaintiff failed to exhaust an available administrative remedy. *Crouch*, 27 F. 4th at 1320; *Reid v. Balota*, 962 F.3d 325, 329 (7th Cir. 2020).

Defendants argue that Floyd failed to exhaust his remedies because he did not properly submit an appeal, because although he marked the box for an appeal by filling in a date, he did not provide any explanation or reason as to why he was appealing. The Court is not convinced.

As an initial matter, Defendants point to no evidence in the record regarding the Jail's exhaustion policies and procedures, or how those policies were communicated to Floyd. *See Reid*, 962 F.3d at 329 (noting that defendants must show that remedies were available, and that the

plaintiff failed to use them); *Ramirez v. Young*, 906 F.3d 530, 538 (7th Cir. 2018) (noting that a correctional facility must take reasonable steps to inform inmates about any required exhaustion procedures). While it is true that Floyd failed to respond to Defendants' Local Rule 56.1 statement, and that he does not address exhaustion in his brief, it is Defendants' burden to establish their exhaustion affirmative defense. Defendants' failure to submit any evidence regarding the Jail's exhaustion policies and procedures, and how those requirements were communicated to Floyd, makes it impossible for the Court to determine, as a matter of law, that Floyd failed to comply with those policies and procedures.

Furthermore, Defendants do not address the fact that the grievance response that Floyd received on July 22, 2021, the one that he marked the box for appeal, merely stated that the matter would be referred to the OPR. (*See* Dkt. 63-6 at 7.) While Defendants fault Floyd for failing to explain the basis of his appeal, and Floyd himself apparently admitted he should have explained his reasons, Defendants point to no evidence in the record or legal authority indicating that Plaintiff was *actually required* to appeal such a determination that his grievance was simply being referred to OPR. In fact, the Seventh Circuit held the exact opposite in a similar case last year involving a detainee at the Cook County Jail. *See Hacker v. Dart*, 62 F.4th 1073, 1081 (7th Cir. 2023).

In *Hacker,* as in the instant case, the plaintiff submitted a grievance and received a response notifying him of a referral to the OPR, and the response form stated that he had 15 days to appeal. *Id.* at 1079. The plaintiff did not appeal, however, and the OPR eventually issued a determination several months later rejecting plaintiff's claims of staff misconduct. *Id.* In the subsequent civil rights lawsuit based on the complaints raised in the grievance, the jail defendants argued that the plaintiff had failed to exhaust his administrative remedies by failing to file an appeal within the 15-day window after receiving the initial grievance response, and by failing to appeal

11

OPR's ultimate denial of his claim. *Id.* at 1078, 1080–81. But the Seventh Circuit rejected the defendants' arguments. The court saw no reason why an inmate in the plaintiff's position would have believed that they should have filed an appeal over a notification that their allegations of abuse were being investigated by OPR, because the fact of a referral itself would not indicate to the inmate that there was anything to appeal at all. *Id.* at 1081 ("[A]nyone receiving the notice of referral would have reacted by thinking the process was working and moving forward as it should—not by concluding there was anything to appeal. . . . Put simply, no ordinary prisoner would think to appeal an update that the jail was following its own rules."). Nor did the jail inform the inmate that he was required to appeal after OPR issued its final decision. *Id.* The appeals court found that the jail's grievance process "fell well short of" being "transparent enough for ordinary prisoners to navigate." *Id.* at 1083. The Court thus held that the Cook County Jail's grievance procedures became unavailable to the plaintiff after the jail involved OPR, and his failure to appeal did not doom his claims. *Id.* at 1081.

The Seventh Circuit's decision in *Hacker* controls here. As in that case, there is nothing in the record or the response notice itself that indicates that Floyd should have known he had to file an appeal of the decision to refer his grievance to OPR. It is therefore irrelevant that Floyd did not properly complete the appeal section of the form and provide a reason for his appeal, because there was no notice to Floyd that there was anything to appeal. Nor, as in *Hacker*, is there any indication that Floyd was told he was required to appeal the ultimate decision from OPR rejecting his claim. On this record then, the Court cannot find as a matter of law that Floyd had an available administrative remedy that he failed to exhaust. Instead, as in *Hacker*, the Court concludes that the grievance process became unavailable to Floyd once he received notice of the referral of his claim to OPR, because the procedures and requirements for what actions, if any, Floyd was required to

take at that point were not transparent enough for an ordinary prisoner such as Floyd to navigate. *See id.* at 1083. The Court therefore concludes that Defendants are not entitled to summary judgment on exhaustion grounds.

## II. Excessive Force under the Fourteenth Amendment

Turning to the merits of Floyd's § 1983 claim: Because Floyd was a pretrial detainee at the relevant time, his claim for excessive force arises under the Fourteenth Amendment's Due Process Clause. *See Kingsley v. Hendrickson*, 576 U.S. 389, 400 (2015).[4] Under the Fourteenth Amendment, an officer's use of force is excessive if it amounts to punishment. *Id.* at 397. This includes actions undertaken "with an 'expressed intent to punish,'" and those which are "not 'rationally related to a legitimate nonpunitive governmental purpose,'" or "'appear excessive in relation to that purpose'" when viewed objectively. *Id.* at 398 (quoting *Bell v. Wolfish,* 441 U.S. 520, 538, 561 (1979)).

To prevail on an excessive force claim, a pretrial detainee must show that the force purposely or knowingly used against him was objectively unreasonable. *Id.* at 396–97. Whether the force was objectively reasonable depends on the facts and circumstances of each case. *Id.* at 397. Factors to be considered in evaluating objective reasonableness include: (1) the relationship between the need for use of force and the amount of force used; (2) the extent of the plaintiff's injury; (3) any effort made by the officers to temper the amount of force used; (4) the severity of the security problem at issue; (5) the threat reasonably perceived by the officer; and (6) whether the plaintiff was actively resisting. *Id.* at 397. The Court is required to consider all these factors from the perspective of what a reasonable officer on the scene would have understood, not with

---

[4] Floyd's Complaint claims a violation of his rights under the Eight Amendment to be free from cruel and unusual punishment. But it is the Fourteenth Amendment, and not the Eighth, that applies to Floyd's time as a pretrial detainee, and the Court will construe Floyd's claim as properly brought under the appropriate Fourteenth Amendment framework.

the benefit of hindsight. *Id.* The court also must take into consideration the government's need to manage the facility in which the plaintiff was detained and should defer to jail policies and practices that are "needed to preserve internal order and discipline and maintain institutional security." *Id.* (cleaned up).

The Court acknowledges that excessive force cases are often—but not always—poor candidates for summary judgment, because in many instances there are disputes of fact about what occurred. *See, e.g.*, *Harris v. Ealey*, No. 19-cv-2210, 2021 WL 5823513, at *4–5 (N.D. Ill. Dec. 8, 2021). The Seventh Circuit has emphasized, however, that "whether a particular use of force was objectively reasonable is a legal determination rather than a pure question of fact for the jury to decide." *Id.* (cleaned up) (collecting cases); *see also Catlin v. City of Wheaton*, 574 F.3d 361, 367 (7th Cir. 2009) (observing that while summary judgment should be granted sparingly in excessive force cases, this holds true only when the parties "tell different stories about what happened[]").

In this case, the parties largely agree on the relevant facts outlined above, which are based almost entirely on Floyd's deposition testimony and the video evidence. Based on the record and drawing all reasonable inferences in Floyd's favor as the non-movant, it is essentially undisputed that Floyd's wrist-injury was caused by one or more officers pulling on the chain connected to his handcuffs through the food-port opening during the approximately 10 seconds that Floyd was struggling with Defendants as they attempted to secure him in his cell. Where the parties disagree is the legal determination of whether, based on these undisputed facts, Defendants' use of force in getting Floyd into his cell was reasonable under the circumstances. Defendants argue that they used only reasonable force to attempt to move Floyd to his cell, pointing to the undisputed facts that Floyd refused to return to his cell, physically resisted, and threatened officers. Defendants also

point out that it is undisputed that they discontinued the use of force when they could do so safely once Floyd was in his cell and the door was secured. Floyd contends, on the other hand, that the laceration to his right forearm, which he states required nine stitches, demonstrates that Defendants used excessive force. Floyd also argues that he was injured because officers continued to use force after he was placed in his cell, by pulling on the chain attached to his handcuffs. Finally, Floyd argues that Defendants were acting maliciously because they violated jail policy by not giving him a shower as he requested, and further by failing to call for a sergeant when he initially refused to cooperate.

Upon review of the evidence and the parties' arguments, and the applicable *Kingsley* factors, the Court ultimately concludes that Defendants' use of force was reasonable under the circumstances as a matter of law.

The first factor, the relationship between the need for use of force and the amount of force used, and the sixth factor, whether the plaintiff was actively resisting, both strongly weigh in Defendants' favor. The record demonstrates that Defendants used force only after Floyd refused to comply with verbal orders, and continued to use force only because Floyd continued to refuse to comply and was actively resisting going back into his cell. Floyd admitted in his deposition that he was angry with officers and was not cooperative, and the video evidence shows Floyd actively resisting officers' efforts to move him to his cell by dropping to the floor and hooking a leg around a seat. The footage further shows, and Floyd himself admitted, that he also threatened officers and engaged in self-harm by banging his head against the wall, and that when he was moved to his cell, he continued to resist. Not only does the video footage plainly show Floyd actively resisting officers' attempts to move him into his cell and refusing to place his hands through the food-port opening so that his handcuffs could be removed, but Floyd also expressly admitted that he placed

his body in the door in an attempt to keep it from closing. (*See* Pl.'s Dep. Tr., Dkt. 63-3 at 54:19–55:6.).

The third through fifth *Kingsley* factors similarly weigh in Defendants' favor and indicate their use of force was reasonable. As to the third factor, the officers' effort to temper the amount of force used, the record reflects that Defendants did not use any force after the door to Floyd's cell was closed and he had ceased resisting. As to the fourth and fifth factors, the threat of the security problem at issue and the threat reasonably perceived by the officers, Floyd had a history of conflict with officers and was housed on a punitive tier at the time of this incident. A reasonable officer in Defendants' position would have not only perceived a heightened security problem and threat to the officers or other inmates based on Floyd's history and confinement to a segregated tier, but also would have perceived a serious threat once Floyd began activity resisting.

In short, Defendants' use of force, that is, their pulling on the chain attached to Floyd's handcuffs, did not occur in a vacuum or without any purpose. Rather it occurred as a reasonable response to Floyd, an inmate in segregation with a history of threatening officers and disobeying orders, refusing orders and actively resisting Defendants' efforts to place him in his cell.

In his deposition testimony, Floyd seemed to suggest that the officers should have told him to put his hands through the food port so that his handcuffs could be removed, and that their failure to do so shows that they purposefully tried to harm him after he was in his cell and no longer aggressive. (Pl.'s Dep. Tr., Dkt. 63-3 at 62:4-10; 64:18–65:2.) But Floyd acknowledged that he was still trying to "push out the cell" as officers pulled the chain through the food port. (*Id.* at 58:1–12.) And while he contends that officers kept "pulling and pulling" on the chain as if they purposefully wanted to harm him, (*see id.* at 16:19-17:5), this assertion is not consistent with the video evidence. The video footage does not show officers repeatedly pulling on the chain, but

16

rather shows officers struggling to hold onto the chain through the food port as Floyd actively resisted going into his cell. Floyd's contention is also inconsistent with his admissions that it took about 10 seconds for Defendants to secure the cell door and that they did not use force after his hands were through the food port, all of which is also confirmed by the video footage. Again, it is evident from the footage that officers were only using force on the chain in response to Floyd's resistance, and ceased using force as soon as he was secure in his cell.

Floyd also points to his injury—the laceration on his forearm—as evidence that the force Defendants used was excessive. (*See* Dkt. 69 at 3.) But while the extent of the injury is relevant under the second *Kingsley* factor, because it provides some indication of the amount of force applied, *see McCottrell v. White*, 933 F.3d 651, 664 (7th Cir. 2019), "[i]njury and force . . . are only imperfectly correlated, and it is the latter that ultimately counts." *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010). Thus, the fact of Floyd's injury, on its own, is not dispositive of whether Defendants' use of force was unconstitutionally excessive. What matters is whether, under all the circumstances and in consideration of all the *Kingsley* factors above, the use of force was objectively reasonable notwithstanding the resultant injury. The Court concludes that it was under all the circumstances and in consideration of the other *Kingsley* factors above.

The Court notes that correctional officers are not required to use "the least amount of force possible" to restrain an inmate. *Harris*, 2021 WL 5823513, at *5. Rather, the force used must be reasonable under the circumstances. *Id.* (citing *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003)). The reasonableness of an officer's conduct depends on what they are "facing at the time," including whether the inmate is "threatening violence." *Id.* As many courts have observed, officers encountering a recalcitrant inmate "do not have the luxury of time, and they do not act in an adrenaline-free environment." *Id.; see Clay v. Williams*, No. 17 C 6461, 2020 WL 2836740, at *9

(N.D. Ill. May 31, 2020) ("Officers must make split-second decisions about the use of force in tense, uncertain, and rapidly evolving environments.").

In this case, Floyd resisted throughout the encounter, refusing officers' instructions and actively attempting to prevent them from moving him to his cell and closing the door. While Floyd contends that he was in "no position to hurt" Defendants because he was handcuffed and shackled during the encounter, (*see* Dkt. 69 at 3), this ignores the undisputed evidence that Floyd threatened to spit on officers and engaged in self-harm, as well as the undisputed evidence that handcuffs and other restraints can be used as weapons if not controlled. Under these circumstances, where Floyd was actively resisting and threatening officers, and where a reasonable officer would have perceived a security threat based on Floyd's history and his act of resistance, the Court finds that the Defendants' response, including pulling on the chain connected to Floyd's handcuffs through the food port, was not unreasonable based on the undisputed evidence. *Stubblefield v. Jones*, No. 12 C 8166, 2015 WL 2128602, at *1, 3, 6 (N.D. Ill. May 5, 2015) (granting summary judgment to Cook County Jail correctional officers in similar case where an inmate was injured by officers pulling on chain attached to the inmate's handcuffs, concluding that the officers used reasonable force in briefly pulling on the chain in response to the inmate "yanking" the chain away from officers).

In ruling for Defendants, the Court does not seek to diminish Floyd's injury. He can be heard screaming in pain on the video footage and can be seen with blood on his wrist from a cut apparently caused by his handcuffs. But the fact that Floyd was injured, while unfortunate, does not mean that the amount of force used against him was unreasonable such that it violated his Due Process rights under the Fourteenth Amendment. As Defendants argue, they could not allow Floyd to remain in the cell handcuffed because handcuffs can be used as weapons, and Defendants could

only remove Floyd's handcuffs after he was in his cell with his hands through the food port. But Floyd admitted, and the video confirms, that he actively resisted Defendants by twisting his body in an effort to get out of the cell, and further the record shows that Floyd resisted for approximately 10 seconds without placing his hands through the food port so that the handcuffs could be removed. Assuming that Floyd's injury was caused in the manner he states—by officers pulling on the chain attached to his handcuffs and fed through the food port—a reasonable jury could not find that this constituted an unreasonable use of force in light of all the facts and circumstances. Rather the only conclusion that can be drawn on the record and video evidence is that the officers were using reasonable force to attempt to secure Floyd in his cell so that his handcuffs could be removed, but that Floyd was actively resisting and was injured in the process.

Floyd separately argues that Defendants' failure to follow jail procedures—either by allowing him to shower or by acceding to his request that they call a sergeant—demonstrates that their subsequent use of force was excessive. But this argument also fails. Floyd points to no evidence of the alleged jail procedures that Defendants are purported to have violated. But even if he had, whether or not Defendants complied with jail policies is not determinative of whether they violated Floyd's constitutional rights. *See Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006) ("[T]his court has consistently held that 42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of . . . departmental regulations and police practices."). The issue is not whether Defendants violated Jail policy, but whether the use of force was reasonable under all the circumstances, which, as the Court has explained above, it was.[5]

---

[5] Floyd makes a passing reference in his response brief to a "disciplinary report for one of the defendants," which states that the officer violated Floyd's rights. But the Court cannot identify any such disciplinary report in the summary judgment record—there is nothing attached to Floyd's brief—and it is not this Court's job to comb through the docket to find evidence in support of Floyd's position. Again though, even if it such a record existed, a report that an officer violated jail policy would not demonstrate a constitutional violation. Rather the determination of whether Defendants violated Floyd's rights is a matter of law for the Court to decide, and a jail official's opinion on that issue, such as any opinion actually exists, is irrelevant.

Another problem with Floyd's argument that Defendants were improperly denying him a shower or disregarding jail rules is the implicit suggestion that Floyd was thus somehow entitled to disregard Defendants' orders because they were, in his opinion, improper. This is not a correct statement of the law. Inmates must comply with orders because their failure to do so places correctional officers and other inmates in danger. *Lewis v. Downey*, 581 F.3d 467, 476 (7th Cir. 2009) ("Orders given must be obeyed. Inmates cannot be permitted to decide which orders they will obey, and when they will obey them."). Floyd's belief that he was entitled to a shower, or entitled to speak with a sergeant, does not justify his failure to obey the order that he return to lockup. *See Huff v. Tabler*, No. 3:18-CV-122, 2019 WL 3499494, at *2–3 (N.D. Ind. July 31, 2019) (rejecting plaintiff's argument that he was entitled to disobey order to return to his cell because he was entitled to an hour out of his cell). As the court observed in *Huff*, "Detainees cannot be allowed to disobey orders based on their personal understanding of constitutional law, and, when detainees refuse to disobey orders, jail officials have limited options at their disposal to maintain discipline and security." *Id.* at *3. The undisputed record in this case demonstrates as a matter of law that Floyd refused to comply with Defendants' orders, and that their subsequent use of force was reasonably calculated to gain compliance.

In sum, the Court concludes that Defendants are entitled to summary judgment because their use of force was objectively reasonable as a matter of law. Because Defendants are entitled to summary judgment, the Court need not address their alternative argument on qualified immunity grounds. Final judgment will be entered in favor of Defendants. If Floyd wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1)(A). If Floyd seeks leave to proceed *in forma pauperis* on appeal, he must file a motion

for leave to proceed *in forma pauperis* in this Court stating the issues he intends to present on appeal. *See* Fed. R. App. P. 24(a)(1).[6]

**Conclusion**

Defendants' motion for summary judgment (Dkt. 63) is granted and judgment is entered in Defendants' favor. This case is closed.

DATE: 7/3/24

_Nancy L. Maldonado_
_____
Nancy L. Maldonado
United States District Judge

---

[6] Plaintiff need not bring a motion to reconsider this Court's ruling to preserve her appellate rights. However, if Plaintiff wishes the Court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See* Fed. R. Civ. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).